UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JARED M. MCVEY, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>CAROLYN COLVIN Acting Commissioner )<br>of Social Security, )<br>)<br>Defendant. ) | No. 1:15-cv-00034-TAB-SEB |

**ORDER**

**I.    Introduction**

Pending before the Court is Plaintiff Jared M. McVey's appeal of the Commissioner's denial of his claim for disability benefits. McVey asserts that the Administrative Law Judge erred in finding he was not disabled by (1) failing to properly weigh the medical source opinions, (2) making a patently wrong credibility determination, and (3) failing to include all his limitations in the hypothetical to the Vocational Expert. For the reasons set forth below, McVey's brief in support of appeal [Filing No. 22] is granted.

**II.   Procedural Background**

McVey applied for child's insurance benefits on October 20, 2011, alleging disability beginning January 1, 2009. McVey also applied for disability insurance benefits and supplemental security income on October 17, 2011, alleging disability beginning January 1, 1999. Each claim was denied initially on November 18, 2011, and on reconsideration January 3, 2012. On January 9, 2013, McVey, who was represented by an attorney, testified at a hearing before the ALJ and an impartial VE. Also present were two witnesses, a medical expert and

McVey's girlfriend. On February 1, 2013, the ALJ issued his decision finding that McVey is not disabled.

At step one, the ALJ found that McVey had not engaged in substantial gainful activity during the relevant time period. At step two, the ALJ found that McVey's severe impairments included a history of seizure disorder and juvenile convulsive and myoclonic seizures. At step three, the ALJ concluded that McVey did not meet or equal any relevant listing. At step four, the ALJ found McVey has the RFC to perform a full range of work at all exertional levels, but limited to

> no exposure to moving machinery or unprotected heights; no climbing of ladders, ropes, or scaffolds; no work in close proximity to sharp objects or other hazards; and only occasionally climbing of ramps and stairs.

[Filing No. 14-2, at ECF p. 19.] The ALJ found that while McVey has worked, it was never above the substantial gainful activity level, and so McVey has no past relevant work. [Filing No. 14-2, at ECF p. 26.] At step five, the ALJ found that McVey could perform jobs in the national economy as an apparel sorter, information clerk, or cafeteria cashier. [Filing No. 14-2, at ECF p. 27.] This decision became final when the Appeals Council denied McVey's request for review. This appeal followed.

### III. Standard of review

The Court must uphold the ALJ's decision if substantial evidence supports his findings. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). "The substantial evidence standard requires no more than such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Blakes v. Barnhart*, 331 F.3d 565, 568 (7th Cir. 2003). The ALJ is obligated to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of nondisability while ignoring evidence that points to a disability finding. *Denton v. Astrue*, 596

F.3d 419, 425 (7th Cir. 2010). If evidence contradicts the ALJ's conclusions, the ALJ must confront that evidence and explain why it was rejected. *Moore v. Colvin,* 743 F.3d 1118, 1123 (7th Cir. 2014). The ALJ, however, need not mention every piece of evidence, so long as he builds a logical bridge from the evidence to his conclusion. *Pepper v. Colvin,* 712 F.3d 351, 362 (7th Cir. 2013).

**IV.     Discussion**

McVey argues that the ALJ made three reversible errors. First, he failed to properly weigh the medical source opinions. Second, he made a patently wrong credibility determination based on McVey's treatment. Third, he failed to include all of McVey's limitations in the hypothetical to the VE. The Commissioner contends that the ALJ's conclusions are supported by substantial evidence in the record. As explained below, the Court agrees with McVey.

   *A.     Weight given to McVey's physicians*

The ALJ evaluated the opinions of five physicians. [Filing No. 14-2, at ECF pp. 25-26.] Great weight was given to Dr. Farber, the medical expert who testified at the hearing, and Dr. Ruiz, the agency's examining physician. Probative weight was given to Dr. Sharba, McVey's neurologist, and Dr. Djodjeva, the agency's consultative examiner. Minimal weight was given to Dr. Erb, McVey's treating physician since birth. McVey takes issue with the weight given to four of these physicians.

A treating physician's opinion is entitled to controlling weight as long as it is well supported by objective medical evidence and is consistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2); *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). If the ALJ determines that a treating doctor's opinion is not entitled to controlling weight, he must evaluate it and determine what weight to give it. *Id.* An ALJ is not required to give a treating

3

physician's opinion controlling weight, although he must provide a sound explanation for rejection. *Id.*

A nontreating source's opinion is not entitled to the same controlling weight as a treating physician. 20 C.F.R. § 404.1502; *Simila v. Astrue*, 573 F.3d 503, 514 (7th Cir. 2009). An ALJ determines the weight a nontreating physician's opinion deserves by examining how well it is supported and explaining whether it is consistent with the record. *Id.* at 515.

    1.    Dr. Erb

Dr. Erb was the only treating physician in the record before the ALJ. Dr. Erb has been McVey's treating physician since birth and has treated McVey's seizure disorder into adulthood. Essentially, the ALJ gave Dr. Erb minimal weight because he found there was not enough objective evidence in the record to support Dr. Erb's assertion that McVey experienced frequent seizures. The ALJ gave two main reasons for this conclusion. First, the ALJ found that the EEGs, MRIs, CT scans, and neurological evaluations did not objectively document a basis for Dr. Erb's opinion. [Filing No. 14-2, at ECF p. 25.] Second, the ALJ discredited Dr. Erb's opinion for not being corroborated by emergency room visits or phone calls from McVey after each seizure. [Filing No. 14-2, at ECF p. 25.] These reasons are erroneous and the ALJ's conclusion is not supported by the record.

The EEG evidence in the record does not conflict with Dr. Erb's opinion that McVey has frequent seizures. McVey points to two abnormal EEGs in the record. The first EEG was performed after a new onset seizure and was noted to be consistent with epilepsy. [Filing No. 14-7, at ECF p. 84.] The second EEG was performed after Dr. Erb referred McVey to a seizure specialist upon learning of increased frequency. [Filing No. 14-8, at ECF p. 11.] The EEG technician recommended correlation since it was unclear whether the electrodes were picking up

eye movements or epileptiform. [Filing No. 14-8, at ECF p. 11.] Correlation was not done, but McVey argues this EEG does not detract from Dr. Erb's opinion since it nevertheless showed abnormalities associated with epileptic seizures. [Filing No. 14-8, at ECF p. 11.]

The Commissioner argues this situation is similar to *Rice v. Barnhart*, 384 F.3d 363, 370-71 (7th Cir. 2004), where clinical findings were negative but the doctor alleged limitations based only upon subjective complaints. The *Rice* court held that an ALJ should rely on medical opinions based on objective findings and not merely "a recitation of a claimant's subjective complaints." *Id.* at 371. However, the situation at hand is different than *Rice*. While Dr. Erb did rely on his discussions with McVey, he had at least two abnormal EEG reports as objective findings to form a basis for his opinion. Dr. Erb was not wrong for considering McVey's subjective complaints about his seizure disorder and he did not use it as the sole basis for his opinion. Therefore, *Rice* does not apply. It was not proper for the ALJ to discount Dr. Erb's opinion for lack of objective support when he had two abnormal EEGs on which to rely.

Nor was it proper for the ALJ to discredit Dr. Erb's opinion because McVey did not visit the emergency room or contact Dr. Erb after each seizure. The ALJ's opinion discusses a note by Dr. Erb which states, "labs ok except Depakote level low, make sure taking regularly and if any seizures, let us know, will need to increase dose." [Filing No. 14-8, at ECF p. 66.] The Commissioner contends McVey's apparent failure to contact Dr. Erb after each seizure negated the basis of Dr. Erb's opinion that McVey experienced frequent seizures. However, McVey argues that Dr. Erb did not tell him to affirmatively contact him after each seizure. Rather, McVey asserts it was sufficient that he discussed the frequency at regular appointments.

McVey points out that after Dr. Erb made the treatment note relied on by the ALJ, he told Dr. Erb that his seizures were increasing in frequency during a regularly scheduled appointment.

[Filing No. 14-8, at ECF p. 51.]  In response, Dr. Erb referred McVey to Dr. Sharba, a neurologist specializing in seizure disorders.  [Filing No. 14-8, at ECF p. 16.]  Dr. Sharba confirmed that McVey's seizures were increasing in frequency.  [Filing No. 14-4, at ECF p. 41.]  McVey's girlfriend, the only witness to his seizures on a regular basis for the last two years, testified that she witnessed him having grand mal seizures about every ten days and blackouts about two times a day.  [Filing No. 14-2, at ECF pp. 54, 56, 57.]  She testified that she has a child with McVey and his seizures are frequent enough that he cannot safely care for the child.  [Filing No. 14-2, at ECF p. 54.]  "[A]nything that he does with the baby, the baby is laying down on the floor … [h]e doesn't know if he's going to drop him."  [Filing No. 14-2, at ECF p. 57.]  These are examples of conflicting evidence in the record that should have been addressed by the ALJ before concluding that Dr. Erb's opinion on frequency was unsupported.

  The best support for the ALJ's conclusion is that Dr. Farber found Dr. Erb's records of McVey's seizures are not objective "unless he witnessed a seizure … in his office."  [Filing No. 14-2, at ECF p. 40.]  However, the Court finds no support for this claim in the regulations or case law.  Instead, the Court agrees with McVey that Dr. Erb can be made aware of how often the seizures are occurring without emergency room visits and phone calls to the office.  The ALJ made an unreasonable interpretation of Dr. Erb's note—that he would be unaware of the frequency of McVey's seizures unless McVey visited the hospital or called after each seizure.  The ALJ's analysis of Dr. Erb's opinion was erroneous.  He did not give a sound explanation for giving Dr. Erb minimal weight and his conclusions are not supported by the record.

    2. *Dr. Farber*

 Dr. Farber was the medical expert who testified at the hearing.  Beforehand, Dr. Farber reviewed all the medical evidence in the record, but he did not perform a physical exam.  [Filing

No. 14-2, at ECF p. 36.] The ALJ afforded great weight to the opinion testimony of Dr. Farber, finding that his explanation was supported by the diagnostic EEGs, MRIs, CT scans, and normal neurologic exams of record. [Filing No. 14-2, at ECF p. 25.] The ALJ also found Dr. Farber's opinion should be given great weight since he reviewed the entire record including the most current information, is knowledgeable about the Social Security program, and has experience as an impartial medical expert. [Filing No. 14-2, at ECF p. 25.] McVey argues that the ALJ failed to properly evaluate Dr. Farber's opinion and reliance on his testimony is misplaced. The Commissioner contends that Dr. Farber's opinion is supported by a comprehensive explanation and consistent with the record.

The Court agrees with McVey that the ALJ improperly weighed the opinion of Dr. Farber. Dr. Farber testified at the hearing as an expert witness on McVey's seizure disorder, however he is a pulmonologist and an internist. [Filing No. 14-2, at ECF p. 35.] "A neurologist is an expert in the treatment of disorders of the nervous system such as epilepsy." *Spath v. Hayes Wheels Int'l-Indiana, Inc.*, 211 F.3d 392, 394 (7th Cir. 2000). McVey argues that Dr. Farber's testimony demonstrates his lack of understanding of seizure disorders, making the ALJ's heavy reliance on his opinion erroneous. For example, Dr. Farber stated that despite evidence that McVey experiences seizures, they were mostly "juvenile seizures which tend to go away." [Filing No. 14-2, at ECF p. 36.] But as McVey points out, there is no support in the record that his seizures went away and the assertion is perhaps contrary to general medical opinion.[1] The record instead supports an increase in seizure activity as McVey became an adult.

---

[1] McVey cites to WebMD, the U.S. National Library of Medicine, and epilepsy.com for the proposition that juvenile seizures tend to last into adulthood. While this does not prove McVey continued having seizures as an adult, it is enough to question the reliability of Dr. Farber's opinion, when coupled with the lack of evidence in the record to support his assertion that McVey's seizures may have gone away when he became an adult.

7

[Filing No. 14-2, at ECF pp. 41-42; Filing No. 14-4, at ECF pp. 41-42.]  Dr. Farber also opined that McVey's seizures "might be restless leg syndrome."  [Filing No. 14-2, at ECF p. 36.] Again, restless leg syndrome is not mentioned anywhere in the record.  Dr. Farber's opinion about restless leg syndrome is completely unsupported and an odd assertion by a nonexamining physician.

The Court also agrees with McVey that Dr. Farber's testimony is contradicted.  Dr. Farber stated that "in order to establish a seizure disorder, at least as an adult, we would have to have positive EEG evidence."  [Filing No. 14-2, at ECF p. 37.]  As discussed previously, two EEGs have been performed on McVey.  However Dr. Farber concluded, "I don't think we have medical evidence, at least EEG evidence that we have some sort of seizure activity."  [Filing No. 14-2, at ECF p. 37.]  Dr. Farber emphasized the lack of corroboration on the second EEG, but upon being questioned by McVey's attorney, Dr. Farber conceded that McVey had a seizure disorder and that his EEG might show seizure activity.  [Filing No. 14-2, at ECF p. 39.]  In one breath Dr. Farber said there is no EEG evidence of seizures, but in another he said there is.  Similarly, Dr. Farber opined in one statement that McVey may have restless leg syndrome, but in another that he has a seizure disorder.  Dr. Farber's expert opinion is wishy-washy.  He testified extensively how unlikely it is that McVey has a seizure disorder, but suggested the ALJ apply restrictions "for anybody who had a seizure disorder, who was able to work."  [Filing No. 14-2, at ECF p. 38.]  It appears the ALJ's decision to afford great weight to Dr. Farber is guided by the latter half of this statement.  Dr. Farber's testimony is unsupported and contradicted, but he found McVey was able to work.  This is not a proper reason to give Dr. Farber's opinion the greatest weight.

The ALJ did not confront Dr. Farber's unsupported opinions, such as the likelihood that McVey's seizures were actually restless leg syndrome or that juvenile onset seizure disorders tend to go away. It is not enough that Dr. Farber viewed all the medical evidence and is an experienced medical expert for the agency. The ALJ was required to examine how well Dr. Farber's opinion was supported by the record. Instead, the ALJ's only discussion about the substance of Dr. Farber's opinion was that he explained the diagnostic evidence. [Filing No. 14-2, at ECF p. 25.] It was not reasonable for the ALJ to rely so heavily on Dr. Farber's opinion by giving it great weight. If the ALJ had evaluated whether Dr. Farber's opinion was consistent, both internally and with the record as a whole, he would have likely come to a different conclusion.

        3.    *Dr. Sharba*

As discussed above, Dr. Erb was McVey's treating physician. When McVey complained of increased seizures, Dr. Erb referred him to Dr. Sharba. Dr. Sharba met twice with McVey. On their first meeting, Dr. Sharba ordered an EEG. After it was completed, McVey returned to Dr. Sharba for a follow up. Dr. Sharba then followed up with Dr. Erb to describe his findings. [Filing No. 14-8, at ECF pp. 16-18.] The ALJ gave probative weight to Dr. Sharba's opinion, finding that McVey should have seizure precautions of no driving, scaffolds, or ladders. [Filing No. 14-2, at ECF p. 25; Filing No. 14-8, at ECF p. 18.] McVey argues the ALJ failed to sufficiently explain his decision. The Commissioner contends that Dr. Sharba is a nontreating source and therefore the ALJ's finding is a sufficient explanation.

The Court agrees with McVey. Even though Dr. Sharba is a nontreating source, the ALJ was still required to explain his finding. The ALJ provides only one sentence about the weight to give Dr. Sharba's opinion—his finding. A finding is not the same as an explanation because it

provides no analysis. Dr. Sharba changed McVey's medication dosage and found that his seizures could be intractable. [Filing No. 14-8, at ECF pp. 17-18.] He also found that McVey is likely to have four absences a month and that his seizures cause significant interference with daily activities. [Filing No. 14-4, at ECF p. 42.] The ALJ gives no hints as to why he decided to give Dr. Sharba probative weight, nor does he suggest why he found that seizure precautions were the most important part of his opinion. Accordingly, the ALJ erred by failing to analyze Dr. Sharba's opinion and explain the weight he gave to it.

### 4. *Dr. Djodjeva*

Dr. Djodjeva performed McVey's consultative exam. While the physical exam was unremarkable, she agreed with McVey's diagnosis of seizure disorder and recommended a number of restrictions. In particular, Dr. Djodjeva recommended that McVey not travel without assistance. [Filing No. 14-8, at ECF p. 49.] The ALJ gave Dr. Djodjeva's opinion probative weight to the extent it is consistent with her unremarkable physical exam. [Filing No. 14-2, at ECF p. 26.] McVey argues that the ALJ should have explained why he rejected Dr. Djodjeva's opinion that he required assistance while traveling because it directly affects his ability to work. The Commissioner contends that since Dr. Djodjeva was a nontreating source, the ALJ's brief explanation is sufficient.

But again, the ALJ fails to provide an analysis. The ALJ merely explains that he agrees with Dr. Djodjeva's opinion to the extent it describes McVey as normal. [Filing No. 14-2, at ECF p. 26.] This is not enough. As McVey points out, whether he has the capability of getting to the workplace plays a role in whether he can sustain employment. Additionally, McVey's inability to travel without assistance finds support in the record, particularly with the "no driving" aspect of Dr. Sharba's opinion which the ALJ found probative. [Filing No. 14-2, at

ECF pp. 25, 53, 57; Filing No. 14-4, at ECF p. 42; Filing No. 14-8, at ECF p. 36.] The ALJ should have provided some analysis that explains why he only agreed with the portion of Dr. Djodjeva's opinion that McVey was able to work. "If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p. Dr. Djodjeva's opinion contains restrictions unaddressed by the ALJ's RFC which have a serious impact on McVey's ability to work. As such, the ALJ erred by failing to analyze Dr. Djodjeva's opinion.

Ultimately, it appears that the ALJ took the medical opinions and weighed them in a way that supports a finding that McVey was not disabled. The ALJ provided unsupported findings with little or no explanation. The ALJ must instead give an analysis of each opinion and explain the weight he affords to each, consistent with the regulations. Once he does, it is difficult to imagine he will reach the same result, with Dr. Farber given the most weight and Dr. Erb given the least.

   B.   *McVey's credibility*

McVey argues the ALJ erred by rejecting his allegations of regular seizures because of noncompliance for two reasons. First, he alleges that the ALJ erroneously concluded he was not compliant with his medication regiment. Second, he alleges that the ALJ failed to consider his inability to afford treatment. The Commissioner contends the ALJ provided sufficient other reasons for discrediting McVey.

An ALJ is in the best position to make a credibility determination. *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). An ALJ's credibility determination is entitled to deference, unless his determinations rest on subjective considerations instead of objective factors. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). The Court looks to whether the ALJ considered the

11

entire case record and whether his credibility determination contains specific reasons supported by the evidence of record. *Prochaska* v. *Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006). An ALJ's credibility determination will only be overturned if patently wrong; that is, unreasonable or unsupported. *Id*. at 738. Despite this deferential standard, the Court finds error in the ALJ's credibility analysis.

McVey points to where the ALJ noted that he "has not been compliant in taking prescribed medications." [Filing No. 14-2, at ECF p. 24.] The ALJ reasoned that Dr. Sharba found McVey was "noncompliant with medications as of October of 2011." [Filing No. 14-2, at ECF p. 24.] McVey argues that the record contains notes from visits to his primary care physician for medication refills. But more significantly, Dr. Sharba's treatment notes do not support the ALJ's assertion. Dr. Sharba merely documents that in the past, McVey has been "noncompliant with regards to neurologic follow up." [Filing No. 14-8, at ECF p. 17.] So while Dr. Sharba did find McVey noncompliant, it was not with medication. McVey points out that his Depakote levels were not at the upper therapeutic level when he went to Dr. Sharba, but this was not due to noncompliance with his medication. In fact it was Dr. Sharba who discussed increasing McVey's dosage. [Filing No. 14-8, at ECF pp. 17-18.] Accordingly, the ALJ's finding that Dr. Sharba's opinion suggests noncompliance with medication is unsupported.

McVey also takes issue with the ALJ's conclusion that there was no reason why McVey was not taking his medication regularly. [Filing No. 14-2, at ECF p. 24.] Even if the record supported the ALJ's assertion that McVey was noncompliant with medication, the ALJ failed to consider McVey's financial limitations. In discrediting McVey, the ALJ discussed that he only visited a neurologist, Dr. Sharba, twice and merely receives routine care from his primary care physician, Dr. Erb. [Filing No. 14-2, at ECF p. 24.] While McVey's "statements may be less

credible if the level or frequency of treatment is inconsistent with the level of complaints," SSR 96–7p, an ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide." *Roddy*, 705 F.3d at 638. Like the individual in *Roddy*, McVey lost his health insurance and has difficulty affording treatment. [Filing No. 14-2, at ECF p. 51.] Unlike *Roddy*, the ALJ here does not appear to credit this assertion. Inability to pay is expressly listed in the regulations as a proper explanation for failure to seek treatment. SSR 96–7p. McVey explained to the ALJ at the hearing that he has not been able to afford much treatment since he lost his health insurance. [Filing No. 14-2, at ECF p. 51.] McVey explained that he stopped seeing Dr. Sharba because he had no insurance. [Filing No. 14-2, at ECF p. 53.] McVey told the ALJ that he has been uninsured for almost three years, which prevents him from going to the doctor as frequently as before. [Filing No. 14-2, at ECF p. 52.] Nevertheless, the ALJ did not discuss McVey's inability to afford care when discrediting his allegations of infrequent care. This too was error by the ALJ. As a result, the ALJ's credibility determination is "patently wrong."

      The Commissioner contends that McVey's activities of daily living conflict with his allegations of a disabling seizure disorder. This argument falls flat. The Commissioner discusses activities McVey engaged in prior to his increased seizures. The Commissioner also points out that McVey "performed most activities without any difficulty except for when he was having a seizure." [Filing No. 27, at ECF p. 11.] This is the point: McVey cannot perform work when he is having a seizure. He was fired from Starbucks, Donatos, Speedway, and Stewart Steakhouse because he left work after having a seizure during his shift. [Filing No. 14-2, at ECF pp. 45, 47, 48, 50.] He was fired from Pizza King, McClure, and Fox and Hound because he had

a seizure before his shift began and could not make it to work. [Filing No. 14-2, at ECF pp. 45, 48.] McVey has attempted to work time and time again, but has lost twelve jobs in nine years due to seizures. [Filing No. 14-2, at ECF p. 51.] One large problem for McVey is that he cannot seem to get through the 90-day probationary period without his attendance being affected by seizures. [Filing No. 14-2, at ECF p. 45.] So while the Commissioner is correct that McVey is able to perform most activities without difficulty, his ability to perform is consistently disrupted by seizures. Even if McVey is well enough to work most of the time, it does not mean he can hold down a full-time job. *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008). The ALJ was wrong to discredit McVey on account of his ability to perform well when he was not having a seizure.

      C.      *Hypothetical to the VE*

McVey argues that the ALJ failed to present all his seizure limitations in the hypothetical to the VE. When questioning a VE, an ALJ is required to present the totality of a claimant's limitations. *O'Conner-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010). The hypothetical to the VE "must fully set forth the claimant's impairments to the extent that they are supported by the medical evidence in the record." *Herron v. Shalala*, 19 F.3d 329, 337 (7th Cir. 1994).

McVey likens his case to *Moore v. Colvin*, 743 F.3d 1118 (7th Cir. 2014), where the ALJ concluded that the claimant's well-documented migraines imposed no limitations at all. The *Moore* court found error because the lack of limitations imposed by the ALJ "rest[ed] upon a skewed portrayal of the evidence." *Id.* at 1125. While there was more extensive medical evidence in *Moore*, the error was the ALJ's failure to address the evidence in a balanced manner and impose sufficient restrictions. *Id.* at 1126. The *Moore* court also reasoned that a finding of adverse credibility does not support an ALJ's decision to "impose no limitations whatsoever."

*Id.* at 1125.  As explained previously, the ALJ here improperly weighed the medical opinions and erroneously discredited McVey's testimony.  This is similar to *Moore*.  While the ALJ here imposed some restrictions, he imposed only those which would support a finding that McVey was able to work.  The ALJ had evidence supporting a variety of restrictions beyond those he imposed in the RFC.  The ALJ failed to recognize evidence that McVey's seizure disorder requires more restrictions than simply avoiding hazards.  Notably, the ALJ did not give any limitations for McVey's attendance or ability to travel to and from work.  As a result, the ALJ failed to identify sufficient limitations in the record that arise from his condition.  Accordingly, the ALJ erred by failing to give an appropriate hypothetical to the VE, who in turn found that McVey was capable of work.

**V.      Conclusion**

Overall, the ALJ presented a skewed version of the evidence, as demonstrated by his failure to properly weigh the medical opinions and erroneous credibility assessment.  The ALJ failed to identify all the limitations that would arise from McVey's seizure disorder.  For all these reasons, the Court grants McVey's brief in support of appeal.  [Filing No. 22]  The Commissioner's decision is remanded to the ALJ, consistent with this opinion.

Date:  12/8/2015

_____
Tim A. Baker
United States Magistrate Judge
Southern District of Indiana

Distribution:

Joseph R. Wambach
KELLER & KELLER
joew@2keller.com

Thomas B. Browder
KELLER & KELLER
tomb@2keller.com

Steven Andrew Budde
SOCIAL SECURITY ADMINISTRATION
steven.budde@ssa.gov

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov